## UNITED STATES v. WALLER.

### No. 52 Cr. 172.

United States District Court,
N. D. Illinois, E. D.

Nov. 21, 1952.

Otto Kerner, Jr., U. S. Atty., Chicago, Ill., for plaintiff.

Charles D. Snewind, Chicago, Ill., for defendant.

PERRY, District Judge.

Four counts of an indictment charge that the defendant, on February 14, 1952, unlawfully acquired 208 grains of untaxpaid marihuana in violation of Section 2593(a), Title 26 United States Code; that the defendant, on February 14, 1952, unlawfully transferred to Howard Medley, for the sum of $10, 208 grains of marihuana in violation of Section 2591(a), Title 26 United States Code; that the defendant, on February 14, 1952, unlawfully acquired 3 ounces and 68 grains of untaxpaid marihuana in violation of Section 2593(a), Title 26 United States Code; and that the defendant, on February 14, 1952, unlawfully produced 3 ounces and 68 grains of unregistered and untaxpaid marihuana in violation of Section 3234(a), Title 26 United States Code. The defendant seeks an order of this Court, directing that the use in evidence of a certain United States of America $10 note and of the 3 ounces and 68 grains of marihuana be suppressed on the ground that both items were obtained by means of an unlawful and unreasonable search in violation of the Fourth and Fifth Amendments of the Constitution of the United States.

The defendant, in his petition to suppress, admits that on the date of the search, namely February 14, 1952, he was occupying the premises in question at 6209 South Greenwood Avenue, Chicago, Illinois, as his residence. The government admits that the federal agent had neither an arrest warrant nor a search warrant. The government stipulates that both items are expected to be used in the prosecution of this cause.

According to the testimony, William J. Durkin, an enforcement officer of the Federal Bureau of Narcotics, and Howard Medley, a special employee of the same Bureau, had known each other for a period of four or five months, prior to February 14, 1952. On cross examination, the agent testified that during this period he had discussed the activities of Juanita Murphy and the defendant Silas Waller with Medley and further that Medley had informed the agent "that there had been previous conversations in regards to marihuana."

The testimony further reflects that the federal agent and the special employee had a conversation at a service station, located at 61st Street and Cottage Grove Avenue, on the day of the arrest and shortly prior to the search of the defendant's premises. During the course of this conversation, Medley informed the agent that "he would be able to purchase a quantity of marihuana from one Juanita Murphy," that he had heard about this through a phone call. Thereupon, they both entered a telephone booth, where Medley placed a phone call. After the call, Medley told the agent that he would be able to go over and purchase a quantity of marihuana. They then went to the vicinity of 6209 South Greenwood Avenue, which is a large apartment building. Prior to their entering this building, the federal agent searched Medley and, upon determination that he did not have any money, narcotics, or marihuana on his person, the agent provided him with a previously marked $10 bill.

The agent and the special employee then entered the apartment building. The agent stopped on the second floor while Medley went to the third floor. He heard Medley knocking on the door and, upon Medley's being admitted, he heard the voice of a woman. About five minutes later, Medley returned to the second floor, and, upon the agent's request, gave the agent a package, wrapped in newspaper and containing "a substance which resembled marihuana."

Thereupon, Medley and the federal agent returned to the third floor and Medley knocked on the door. Medley was admitted by Juanita Murphy and the agent immediately followed him into the apartment. They went through the hall into the living room. The agent's testimony continues:

"I showed my shield to Miss Murphy and explained I was a federal officer, and we went into the bedroom, and Mr. Waller was lying in bed. I explained to him who I was and asked him if he had sold a quantity of marihuana to Mr. Medley, which he explained in his words I think were, 'You know I did or you wouldn't be here.' I asked him if he had any other narcotics in the apartment, and he said, 'Out in the

pantry on the window sill.' I asked him to show it to me. He got out of bed, he went to the pantry and pointed to the paper bag which I had removed from the window sill. Upon taking the paper bag from the window sill I noticed a ten dollar bill laying on the cupboard."

As to what happened after the defendant had shown the agent the location of the second quantity of marihuana in the pantry, the agent testified:

"I removed that marihuana, noticed the ten dollar bill laying on the cupboard within the pantry, asked Mr. Waller if this had been the same ten dollar bill used when Mr. Medley had made the purchase. He said 'Yes.' I compared the serial numbers, gave Mr. Waller an opportunity to compare the serial numbers, and then took the ten dollar bill, the marihuana and Mr. Medley—or, Mr. Waller, Miss Murphy, we all went down to our office."

At the very outset of the testimony when the defendant called the agent as an adverse witness, the agent insisted that the marihuana and $10 bill had not been seized but rather that the defendant had surrendered them. He admitted that he "looked around the premises" and that he was there approximately twenty minutes to a half hour. The agent also stated that he placed the defendant under arrest when he went in.

The agent described the apartment as consisting of a large room, a kitchen, and a pantry, adjoining the kitchen. The door of the pantry was ajar when the agent entered it. The second quantity of marihuana was situated on the window sill of the pantry. The $10 bill was on the cupboard within the pantry when the agent took it.

The government seeks to justify this search on the ground that it was incidental to a valid arrest. The defendant insists that it was unreasonable because it was conducted without a search warrant. Furthermore, the defendant contends that his non-resistance to the search of his home and seizure of his property was not a con-

sent on his part but a mere peaceful submission to lawfully constituted authority.

█ As an abstract proposition of law, the government's position represents a correct statement of the law. The right to search the place where the arrest is made and to find and seize things connected with the crime as its fruits or as the means by which it is committed stems not only from the authority to search the person but also from the long standing practice of searching for other proofs of guilt within the control of the accused upon arrest. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; United States v. Pisano, 7 Cir., 193 F.2d 361. The application of this principle, namely, that an arresting officer may search the person and premises under the control of the person arrested as an incident to a lawful arrest, rests upon the existence of an arrest. On the basis of the evidence, the Court encounters considerable difficulty in determining that an actual arrest was made. When the federal agent was called as an adverse witness, he testified that he placed the defendant under arrest when he entered the apartment. Upon direct examination by the government, however, he described the incident in detail and stated that he explained to the defendant that he was a federal agent. A mere announcement or an explanation that one is an officer of the law does not constitute an arrest. It is the view of this Court that the agent's testimony, considered in its entirety, does not reflect that an arrest of the defendant was made. The agent's intent to restrain and actual restraint of the defendant, two important elements of an arrest, are not clearly shown. People v. Mirbelle, 276 Ill. App. 533. Since no arrest was made prior to the search, one cannot justify this search without a warrant on the ground that it was an incident to a lawful arrest.

█ The defendant's first contention cannot be sustained. The fact that a search has been conducted without a search warrant does not of itself render the search unreasonable. The arresting officer may search a person and the premises under his control as an incident to the lawful arrest of that person. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; United States v. Pisano, supra. A person can also consent to a search without a warrant. The constitutional rights as to searches and seizures may be waived. Zap v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477.

██ This leads the Court to the consideration of the defendant's second contention. As it views the evidence, the Court does not regard the defendant's conduct as a peaceful submission to lawfully constituted authority. It considers this conduct a voluntary consent on the part of the defendant. The agent was not a trespasser upon the defendant's premises. It is important to observe that the agent employed no force in gaining entry into the apartment. His prior knowledge of the association and activities of Juanita Murphy and the defendant and the fact that, a few minutes earlier, she had admitted Medley into the apartment gave the agent reasonable grounds to believe that she could grant admission to the apartment. The testimony in the record reveals that this agent heard Juanita Murphy admit the special employee to the apartment. The evidence shows that the defendant raised no objection to the agent's entry and that he knew the agent had been freely admitted by Juanita Murphy.

Thereupon, the agent made an inquiry without the use of any threat or force. The defendant responded not only orally but also by affirmative action when he pointed out the specific location of additional contraband marihuana. He could have well concealed this additional marihuana. On the contrary, he led the agent to its location.

The voluntary nature of a consent should be scrutinized very carefully, particularly when such consent results in the waiver of a constitutional right. The Court has done this in its examination and consideration of the evidence in this cause. It reaches the conclusion that the defendant's conduct constituted a voluntary consent to the search, and not a submission to lawfully constituted authority.

The defendant's petition to suppress is denied.